**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
**COURT FILE NO. 0:15-cv-02286-DSD-JJK**

| | |
|---|---|
| Steven L. Wirtz , <br><br>        Plaintiff, <br><br> v. <br><br> JPMorgan Chase Bank, N.A. and <br> Specialized Loan Servicing, LLC, <br><br>       Defendants. | **MEMORANDUM** <br> **IN SUPPORT OF** <br> **PLAINTIFF'S MOTION** <br> **FOR SUMMARY JUDGMENT** |

## I.   INTRODUCTION

Specialized Loan Servicing could not correct a simple accounting error on Steven Wirtz's mortgage loan. In 2013, Wirtz emerged from Chapter 13 bankruptcy, ready for a fresh start. He had successfully completed payments on his Chapter 13 plan and made all of his mortgage payments during the bankruptcy. To his surprise, although his mortgage should have now been in good standing, he began receiving statements stating that it was running behind.

At the same time Wirtz finished his bankruptcy, Specialized Loan Servicing took over servicing of his mortgage. Wirtz attempted to remedy this problem by contacting SLS. But, after several frustrating phone calls that did not solve anything, Wirtz contacted the Minnesota Attorney General, who wrote to SLS on his behalf. Yet, in response, SLS merely conducted a cursory review of Wirtz's loan and pushed the burden

back on Wirtz. Although SLS was Wirtz's loan servicer and should have had his loan history information, SLS asked Wirtz to provide this to him.

Wirtz then retained an attorney to assist him to resolve this problem. After four letters from Wirtz's attorney to SLS notifying SLS of the error, SLS failed to conduct any real investigation of the issue. Wirtz even went to extraordinary measures and obtained his loan servicing history from his prior servicer and provided it to SLS so SLS could review it. And indeed, the information Wirtz provided showed a misapplication of a payment during his bankruptcy – which caused his loan to improperly fall behind. Unfortunately, SLS did nothing when presented with this information and never fixed the error in Wirtz's loan.

SLS's actions, or lack thereof, are violations of the Real Estate Settlement Procedures Act. RESPA is a consumer protection statute that requires that lenders investigate, and fix when appropriate, errors brought to their attention by borrowers. SLS failed to do this. Because of its breaches of RESPA, and other laws, SLS is liable to Wirtz for actual damages, statutory damages, and attorney fees. Wirtz respectfully requests the Court enter summary judgment in his favor on the claims in his Complaint.

## II.   TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................................... 1

II.   TABLE OF CONTENTS ......................................................................................... 3

III.  STATEMENT OF FACTS ....................................................................................... 5

    A.   Steven Wirtz buys a home and gets a mortgage loan. ...................................... 5

    B.   Wirtz files Chapter 13 bankruptcy and successfully completes his Chapter 13 plan. ..... 5

    C.   After the bankruptcy, servicing of Wirtz's loan is transferred to Specialized Loan Servicing. ...... 6

    D.   Wirtz's problems with SLS start right away. Wirtz did not receive loan statements and his loan is inexplicably reported as late. ...... 8

    E.   Wirtz is unable to resolve this on his own, so he contacts the Minnesota Attorney General, who writes to SLS on his behalf ...... 12

    F.   SLS conducts a cursory review of Wirtz's issue and pushes the burden of investigation back on Wirtz. ...... 13

    G.   Because SLS failed to fix his problem, Wirtz, now through an attorney, writes to SLS again. ...... 15

    H.   SLS again fails to conduct any real investigation into Wirtz's issue or fix his problem and again pushes the burden onto Wirtz. ...... 16

    I.   Wirtz obtains the documents requested by SLS and, again, writes to SLS to notify them of the error on his account. ...... 18

    J.   SLS does not review his documents and does nothing in response to Wirtz's request. . 19

        1.   SLS could have fixed the error in Wirtz's account had it actually reviewed his documents. ...... 19

        2.   SLS did not review Wirtz's documents ...... 22

    K.   SLS's failure to correct the error in his account continues to this day and has created additional problems for Wirtz. ...... 22

IV.  ARGUMENT ............................................................................................................ 24

    A.   Steven Wirtz is entitled to summary judgment under Fed. R. Civ. P. 56. ...... 24

    B.   SLS has violated the Real Estate Settlement Procedures Act ...... 25

1.   RESPA's purpose is to protect consumers like Wirtz against the exact scenario he is in now. ........................................................................................................ 25

2.   Wirtz sent to SLS five qualified written requests. ................................................... 26

3.   SLS failed to conduct a reasonable investigation in response to Wirtz's qualified written requests. .................................................................................................... 27

4.   SLS clearly should have seen that Wirtz's account was in error. Instead, it did nothing. ................................................................................................................ 30

5.   Wirtz has been damaged by SLS's failure to adequately respond to his qualified written requests. ................................................................................................... 33

C.   SLS has breached the implied covenant of good faith and fair dealing. ....................... 36

D.   SLS has violated Minnesota's Mortgage Originator and Servicer Licensing Act. ........ 37

E.   SLS has violated the Fair Debt Collections Practices Act. .......................................... 39

V.   CONCLUSION ................................................................................................................ 40

### III.  STATEMENT OF FACTS

**A.      Steven Wirtz buys a home and gets a mortgage loan.**

Steven Wirtz purchased his home at 69 West Maryland Avenue, in St. Paul, Minnesota in August, 2001. To help finance his purchase, he took out a loan with ABM Amro Mortgage Group, Inc. He borrowed a modest sum of $83,300.00 which was secured by a mortgage on his home.[1] In 2002, Wirtz's mortgage was assigned to Mortgage Electronic Registration Systems, Inc.[2] That same year, JPMorgan Chase took over servicing of Wirtz's loan.[3] Wirtz's loan terms included a fixed interest rate of 7.25%, a monthly principal and interest payment of $568.25, and a late payment fee of 5% of the overdue principal or interest payment.[4]

**B.      Wirtz files Chapter 13 bankruptcy and successfully completes his Chapter 13 plan.**

On February 11, 2008, Wirtz filed for Chapter 13 bankruptcy.[5] Wirtz's Chapter 13 financial reorganization plan was confirmed on June 26, 2008. Wirtz was behind on his mortgage payments at this time and the plan provided that Wirtz would bring the loan current through payments to the Chapter 13 trustee, and that Wirtz would make his ongoing monthly mortgage payments outside of the plan, directly to his servicer at the

---

[1] Affidavit of Daniel M. Eaton in Support of Plaintiff's Motion for Summary Judgment at

[2] Answer of Defendant Specialized Loan Servicing, LLC ("SLS Answer") at ¶ 11.

[3] Defendant JPMorgan Chase Bank's Answer at ¶ 15.

[4] Eaton Aff. at Ex. B.

[5] Complaint at ¶ 19, SLS Answer at ¶ 16.

time, Chase. According to Chase, Wirtz was $2,923.16 behind at the point he filed bankruptcy.[6]

Wirtz was successful in his Chapter 13 bankruptcy. Through the bankruptcy trustee, Wirtz paid off the entire arrearage on his Chase mortgage.[7] The bankruptcy court granted Wirtz's discharge on May 9, 2013.[8]

## C.   After the bankruptcy, servicing of Wirtz's loan is transferred to Specialized Loan Servicing.

After Wirtz successfully completed his Chapter 13 bankruptcy, he was ready for a fresh start. Unfortunately for Wirtz, this marked the start of loan servicing problems that persist to this day. On June 17, 2013, approximately one month after Wirtz's bankruptcy discharge, SLS took over the servicing of Wirtz's loan.[9] At this point, Freddie Mac owned Wirtz's loan.[10]

SLS is a mortgage servicer.[11] SLS does not own any mortgage loans.[12] But, as a servicer, SLS's job is to collect payments, disburse escrow, refer loans in default to foreclosure counsel, and sell homes taken in foreclosure.[13] Additionally, if a borrower has questions or concerns about his or her SLS mortgage, the borrower contacts SLS to

---

[6] Complaint at ¶ 20, SLS Answer at ¶ 16.

[7] Eaton Aff. at ¶ 4; Ex. C.

[8] *Id*. at Ex. D.

[9] 30(b)(6) Deposition of Specialized Loan Servicing, LLC, by Loretta Poch ("SLS Dep."), Eaton Aff. at Ex. E, 16:17-17:6.

[10] SLS Dep. at 18:2-7.

[11] *Id*. at 11:19-21.

[12] *Id*. at 12:10-12.

[13] *Id*. at 11:22-12:5.

address those concerns.[14] SLS is also a debt collector under the Fair Debt Collection Practices Act.[15]

SLS took over the servicing rights to Wirtz's loan as part of a bulk transfer from Chase.[16] When the servicing was transferred from Chase, SLS was supposed to receive Wirtz's loan payment history, loan servicing comments, copies of Wirtz's mortgage and promissory note, and all of the information housed in Chase's "loan servicing platform".[17] As a loan a servicer, SLS was required to abide by the terms of Wirtz's loan – that is, the terms in the mortgage and the note.[18]

The transfer of mortgage servicing is supposed to be a smooth process.[19] Aside from who the borrower sends his or her payments to, or who the borrower calls or writes with questions or concerns, the borrower should experience no further differences when the servicing transfers.[20] In this case, SLS simply took the place of Chase.[21] This makes sense, because the borrower has no say in who services his or her loan or when the servicing rights to the loan transfer.[22]

---

[14] SLS Dep. at 12:6-9.

[15] *Id*. at 24:10-14.

[16] *Id*. at 16:11-15, 18:16-22.

[17] *Id*. at 19:3-12.

[18] *Id*. at 12:13-16.

[19] *Id*. at 19:20-23.

[20] *Id*. at 19:24-20:4

[21] *Id*. at 16-19.

[22] *Id*. at 20:5-8.

**D.    Wirtz's problems with SLS start right away. Wirtz did not receive loan statements and his loan is inexplicably reported as late.**

The transfer of Wirtz's loan servicing was anything but smooth. To start things off, when the servicing was initially transferred, Wirtz did not receive any loan statements from SLS.[23]

Wirtz tried to remedy this. In or about July, 2013, Wirtz called SLS after he received a letter from them. He spoke with a representative identifying himself as Bobby.[24] In the conversation, Wirtz asked the representative when he was going to receive "a book on [his] payment."[25] The representative told Wirtz he should be receiving a statement any day now.[26] The representative then informed Wirtz that his loan was due for his April payment, which surprised Wirtz. The conversation was as follows:

**SLS Rep.:**  Your payment amount is $746.56.

**Wirtz:**    For this month?…

**SLS Rep.:**  That would be going toward April.

**Wirtz:**    April… April?

**SLS Rep.:**  Yes sir.

**Wirtz:**    We're in June, July.

**SLS Rep.:**  Yes sir.

**Wirtz:**    So what's going on there?

---

[23] Affidavit of Steven L. Wirtz in Support of Plaintiff's Motion for Summary Judgment at ¶ 2.

[24] Eaton Aff. at Ex. F.

[25] *Id*. at 00:40-00:56 (min:sec).

[26] *Id*. at 00:56-01:05.

**SLS Rep.:**  … The last payment we received was on June 26, 2013 and was applied toward your March payment.

**Wirtz:**  Okay, okay, something's wrong here. My loan was caught up when they switched this over. I've never missed a payment.

**SLS Rep.:**  I can go ahead and research that for you and call you back and let you know which payments we're showing as being missing.

**Wirtz:**  Well, there is no payment missing. I was current until they switched this and then they sent us a letter saying don't make our payment until we get something from you guys about your buying out our loan. So, I don't know what's going on here – but we are not delinquent. Except for this month and last month and that's because we haven't gotten a payment book.

**SLS Rep.:**  And, uh, I can go ahead and I can research why the prior history and why the prior servicer is saying you are delinquent.

**Wirtz:**  Well, you can do what you want. I'm just telling you we're not delinquent except for those two months – this month and last month. [27]

Approximately two weeks after this, Wirtz had still not received a statement nor any further information from SLS about his problem so he called back and spoke with an SLS representative identifying himself as Steven.[28] Wirtz again explained that he was unable to make a payment because he had not received any statements:

**Wirtz:**  You guys just bought out our loan from another company but we're two payments behind and they told us they'd send us a

_____

[27] Eaton Aff. at Ex. F, 01:10-02:58.
[28] Eaton Aff. at Ex. G.

> payment book and we never got it…. We're waiting for a
> payment book. It's just that simple. I can't send a payment off
> if I don't have an address or a number or any of the
> information.[29]

Wirtz also explains to the representative, again, the problem with his payments and informs the representative that he believes the problem relates to his bankruptcy when the loan was serviced by Chase:

> **Wirtz:** I already talked to one guy there and he said he'd get back to
> me and he never did and that was two weeks ago. And now
> today I get this thing in the mail that says 'this is an attempt to
> collect the debt.' Well, we want to pay the debt but we can't do
> it without a statement.[30]

> **SLS Rep.:** Right now you pretty much just have that total amount due of
> $3039.58 which goes back to April and that's pretty much just
> where we're at.

> **Wirtz:** No, we made a bankruptcy payment that came through our
> bankruptcy and that should have been paid. We're only two
> house payments plus this month behind.[31]

Nothing happened. So, Wirtz called SLS again on or about July 23, 2013 and spoke to a representative identifying herself as Marissa.[32] In the conversation, Wirtz again informed SLS that he had not received mortgage statements since before his loan was transferred to SLS and therefore had not made his last three payments. He told SLS

---

[29] Eaton Aff. at Ex. G, 01:06-01:16; 03:15-03:30.

[30] *Id.* at 08:15-08:33

[31] *Id.* at 08:55-09:25.

[32] Eaton Aff. at Ex. H.

that if he was going to send a large sum of money to catch up his loan, he wanted to make sure it went to the right place.[33] Wirtz also informed SLS, again, that he only owed three payments, not four payments as SLS believed.[34]

In August, 2013, Wirtz made three payments on his loan, which he believed brought his loan current.[35]

Then, on or about August 20, 2013, Wirtz spoke with an SLS representative identifying himself as Oscar and informed SLS again that he believes his loan is being reported as one month late because of an error that occurred during his bankruptcy.[36] The conversation is as follows:

**Wirtz:** We filed bankruptcy and we did not make one month's payment, and that was six years ago. But that payment came out of our bankruptcy and was paid to them, they still won't admit to that. But I have it here somewhere where I can actually send a photostatic [sic] copy that they received that payment out of our bankruptcy payments…"

**SLS Rep.:** When was this?

**Wirtz:** Like five years ago when we missed that.

**SLS Rep.:** …so you think they've been reporting you one month behind ever since then, probably?

---

[33] Eaton Aff. at Ex. H, 03:20-04:43.

[34] *Id*. at 5:09-6:22.

[35] Eaton Aff. at ¶ 10; Ex. I

[36] *Id*. at Ex. J.

> **Wirtz:**     That's the only thing I can tell ya', 'cause we haven't missed any other payments… Somebody screwed up and didn't write down that they got that payment.[37]

The next week, Wirtz called SLS again and spoke with a representative named Maria.[38] Here, Wirtz tells SLS that he should be now caught up on the loan. He says:

> **Wirtz:**     [T]hey say that I'm one payment behind which I'm not. So I sent in the payment that I owe, but I did not send in the other payment that they say I owe because I don't owe it.[39]

Despite Wirtz's efforts, SLS made no corrections to his account.

**E.     Wirtz is unable to resolve this on his own, so he contacts the Minnesota Attorney General, who writes to SLS on his behalf.**

Eventually, fed up with SLS's inability fix a simple problem, Wirtz contacted the Minnesota Attorney General's office. On October 9, 2013, a representative of the Attorney General sent a letter to SLS informing SLS that Wirtz believed that his loan was not delinquent. The AG's office identified Wirtz's problem, stating:

> The first correspondence he received from SLS was regarding delinquent payments and further correspondence indicated that SLS would pursue foreclosure options. He contacted SLS to discuss this matter but to date, the situation has not been resolved.[40]

And, the AG's office identified what Wirtz wanted SLS to do about it, stating:

---

[37] Eaton Aff. at Ex. J, 16:43-17:48.

[38] *Id*. at Ex. K.

[39] *Id*. at 03:02-03:56.

[40] *Id*. at Ex. L; SLS Dep. at 20:14-21:10.

He wants SLS to reflect that his loan is not delinquent and that he is
current, remove any late charges SLS has assessed to his account, and
provide him with an up-to-date status of his loan.[41]

**F.    SLS conducts a cursory review of Wirtz's issue and pushes the burden of
investigation back on Wirtz.**

The inquiry sent by the AG's office was reviewed by SLS's corporate legal

department. Specifically, by a trained paralegal who had many years working in the

mortgage servicing industry.[42] The AG's letter was typical of those reviewed by this

department.[43] The paralegal reviewed SLS's payment histories and loan servicing notes

to determine whether all payments received by Wirtz had been applied.[44] Even though the

payment history she reviewed was supplied by Chase – and not SLS – it was no problem

for her to review it.[45]

However, the payment history in SLS's possession only went as far back as June

11, 2011 – even though Wirtz's loan was originated ten years before, in 2001 and had

been serviced by Chase since 2002.[46] So, the records reviewed by SLS did not include

any errors that occurred prior to June 11, 2011; and therefore SLS would not have been

able to uncover an error that occurred prior to June 11, 2011.[47] Despite knowing that the

mortgage was originated in 2001, and that the servicing records extended further back

---

[41] Eaton Aff. at Ex. L; SLS Dep. at 20:14-21:10.

[42] SLS Dep. at 26:8-11, 26:22-27:5.

[43] *Id.* at 27:6-9.

[44] *Id.* at 27:16-21.

[45] *Id.* at 31:5-12, 32:23-33:5.

[46] *Id.* at 25:25-26:7; Chase's Answer at ¶ 15.

[47] SLS Dep. at 33:24-34:1; 34:2-5.

then 2011, SLS did nothing to investigate additional servicing history. SLS did not contact Chase or any other servicer to obtain additional records.[48]

Based on the review of this partial payment history, the paralegal determined that on June 11, 2011, the earliest date she reviewed, Wirtz's loan was one month behind.[49] And, according to SLS's limited research, at the time the servicing was transferred to SLS, the loan was two months behind.[50]

On October 28, 2013, SLS sent Wirtz a letter stating its findings.[51] SLS included the information above and represented that, at the time of the letter, according to SLS, Wirtz was one month behind on his payments.[52] SLS also drew the impossible conclusion that "the account has been delinquent since the date that Chase began servicing the mortgage loan." [53] But SLS could not have known this. The servicing was transferred to Chase in 2002, yet SLS only reviewed records dating back to 2011. SLS included with the letter the payment histories that it reviewed.[54]

SLS then shifted the burden of the investigation onto Wirtz.[55] Even though the transfer of servicing is supposed to be a smooth process, and should have minimal effect on the borrower, SLS demanded that "[i]f Mr. Wirtz has evidence that his account did not

---

[48] SLS Dep. at 34:6-35:2.

[49] *Id*. at 27:22-28:9.

[50] *Id*. at 28:20-24.

[51] Eaton Aff. at Ex. M; SLS Dep. at 23:19-23:2.

[52] SLS Dep. at 25:7-15.

[53] Eaton Aff. at Ex. M, p. 2.

[54] *Id*. at Ex. N, O; SLS Dep. at 29:8-24, 30:4-17

[55] SLS Dep. at 38:15-39:5.

transfer to Chase in delinquent status, we require that he provides us with evidence of this fact by contacting the company that was servicing his loan prior to Chase and providing us a copy of his payment history." [56] Also, by this statement, SLS fails to consider that the servicing was transferred to Chase in 2002 – yet SLS only reviewed the loan history from 2011. SLS further demanded that Wirtz provide them copies of checks to prove he made payments.[57]

**G.     Because SLS failed to fix his problem, Wirtz, now through an attorney, writes to SLS again.**

SLS clearly did not remedy Wirtz's problem. So, on November 8, 2013, through counsel, Wirtz sent a letter to SLS seeking information about the problem.[58] This letter was a "qualified written request" as defined by the Real Estate Settlement Procedures Act. [59] Included in his request was that SLS provide "[a] full explanation of why SLS believes that Steven Wirtz's mortgage was past due on or before 6/17/13 when SLS was transferred the servicing rights for [the loan]." [60]

The next week, Wirtz, through counsel, sent to SLS another qualified written request which more fully explained his problem.[61] Here, Wirtz again informed SLS that he believed that the accounting of his loan is incorrect.[62] Wirtz also informed SLS that he

---

[56] Eaton Aff. at Ex. M, p. SLS000002.

[57] *Id*.

[58] *Id*. at Ex. P.

[59] SLS Dep. at 41:24-42:11.

[60] Eaton Aff. at Ex. P.

[61] *Id*. at Ex. Q; SLS Dep. at 42:18-43:3.

[62] SLS Dep. at 43:14-17.

believed that it was incorrect in the analysis it provided in its response to the Attorney General's letter.[63]

Wirtz also informed SLS that he believed the accounting problem related to his bankruptcy. He told SLS that his Chapter 13 plan was confirmed June 26, 2008, and since confirmation of the plan, he made all required payments on his loan, both to Chase and in accordance with the plan.[64] Wirtz included a copy of the trustee's report which showed that the trustee made all payments to Chase which caught up his mortgage arrearage.[65] SLS agrees that if Wirtz indeed made all of his payments through his Chapter 13 plan and made his regularly scheduled mortgage payments, then his loan would be current at the time his bankruptcy was discharged.[66]

Later that month, Wirtz sent another qualified written request through counsel. Here, Wirtz informed SLS that he sent to SLS a payment in the amount of $746.67 – a full mortgage payment – in the beginning of October which had not been applied to his account.[67]

**H.     SLS again fails to conduct any real investigation into Wirtz's issue or fix his problem and again pushes the burden onto Wirtz.**

In response to Wirtz's three letters SLS sent a single letter.[68] SLS did not respond to the issues raised in the letters. Instead, SLS merely concluded that it had "previously

---

[63] SLS Dep. at 43:18-44:1.

[64] *Id*. at 46:15-25.

[65] *Id*. at 47:2-49:11.

[66] *Id*. at 49:12-18.

[67] Eaton Aff. at Ex. R; SLS Dep. at 50:14-51:12.

[68] Eaton Aff. at Ex. S; SLS Dep. at 52:22-23:19.

responded to [Wirtz's] requests regarding payment made on the account" and that SLS had "reviewed and confirmed [its] previous responses as accurate."[69]

This review was done by SLS's "customer care group".[70] The representative supposedly reviewed Wirtz's payment history, loan servicing notes, and previous responses to inquiries.[71] Like SLS's legal department, the representatives in the customer care group are intimately familiar on how to read a loan history.[72] However, even though Wirtz made it clear to SLS that the problem persisted, SLS did not review anything other than what it had reviewed before; nor did SLS contact Chase to retrieve further payment history.[73]

SLS stood by its previous response. That is, that it believed that the loan was transferred to Chase in delinquent status.[74] And here, again, SLS placed the burden to investigate this on Wirtz. SLS demanded that Wirtz "provide [SLS] with a copy of the payment history from the servicer prior to Chase bank servicing your loan for further research and review." [75]

---

[69] Eaton Aff. at Ex. S; SLS Dep. at 52:22-23:19.

[70] SLS Dep. at 54:21-55:1.

[71] *Id.* at 57:1-5.

[72] *Id.* at 56:16-23.

[73] *Id.* at 57:6-12.

[74] *Id.* at 57:16-21.

[75] Eaton Aff. at Ex. S.

**I.   Wirtz obtains the documents requested by SLS and, again, writes to SLS to notify them of the error on his account.**

Because SLS had still not addressed his problem, Wirtz sent another qualified written request to SLS on December 27, 2013.[76] Here, again, Wirtz informs SLS that its assertions that Wirtz is behind on his loan are incorrect. Now, with this letter, Wirtz took the extraordinary step of complying with SLS's demand that he conduct the investigation. With his letter, Wirtz sent the payment history for his loan dating all the way back to 2002 and bank statements showing that he made all of his payments.[77] Wirtz had to pay his bank $80.00 to obtain these documents.[78] Although Wirtz was not able to obtain cancelled checks, the bank statements were the best information available as evidence that he made his payments – and he even highlighted the mortgage payments.[79]

Wirtz sent these documents for a reason. He could safely assume the SLS would review them.[80] Further, he had a reasonable expectation that if there was a discrepancy in his payment history, that SLS would find it.[81] Loan histories are notoriously difficult to interpret, particularly for a layperson like Wirtz.[82] But SLS's representatives review these regularly and have no problem doing so.[83]

---

[76] Eaton Aff. at Ex. T; SLS Dep. at 60:14-61:3.

[77] SLS Dep. 61:12-62:1.

[78] Wirtz Aff. at ¶ 3.

[79] SLS Dep. 62:7-19; 90:20-21.

[80] *Id*. at 59:4-17.

[81] *Id*. at 59:10-60:11.

[82] *Id*. at 33:13-16.

[83] *Id*. at 32:18-33:5; 56:16-23.

**J.     SLS does not review his documents and does nothing in response to Wirtz's request.**

Unfortunately, SLS shrugged him off again. Instead of researching the problem, SLS simply pointed to its previous responses and "consider[ed] this matter resolved." [84] Even though Wirtz sent SLS a significant amount of new information, SLS told him that it had already responded to his requests and is not doing anything further. [85] SLS merely recited his payment history. The response provides no reference to any additional documents that Wirtz sent – no reference to the loan history he sent or the bank statements. [86] In fact, there is nothing in the letter that indicates that SLS even looked at the documents that Wirtz sent. [87]

**1.     SLS could have fixed the error in Wirtz's account had it actually reviewed his documents.**

Had SLS actually reviewed the documents Wirtz sent, it would have discovered the error. Part of the loan history Wirtz sent was from the time he was in Chapter 13 bankruptcy and Chase was servicing the loan. [88] Keep in mind, this loan history was something an SLS representative could review and interpret quite easily – had it done so. [89]

---

[84] Eaton Aff. at Ex. I; SLS Dep. at 77:24-78:16.

[85] SLS Dep. 78:17-21.

[86] *Id*. at 78:22-79:7.

[87] *Id*. at 79:8-12.

[88] Eaton Aff. at Ex. U.

[89] SLS Dep. at 66:5-17; 67:4-13.

19

In June, 2010, Wirtz was two years into his bankruptcy and brought the loan to the point that it was one payment behind.[90] He made a regular monthly payment on June 14 and on June 24 SLS applied an additional payment from the suspense account associated with Wirtz's loan.[91] A suspense account is an account that a servicer utilizes when a borrower makes a partial payment on a loan. That money is placed in the suspense account and, as the borrower makes future partial payments, when enough money accrues in the account to equal a full payment, that money is applied to the loan as a monthly loan payment.[92] Suspense accounts commonly come into play when a borrower is in Chapter 13 bankruptcy. The monthly disbursements to the lender from the Chapter 13 trustee typically do not equal a full monthly mortgage payment; so, the disbursements from the trustee are held in the suspense account until enough money accrues to apply a full payment to the loan.[93] Because Wirtz was in Chapter 13 bankruptcy at this time, this June 24, 2010 payment is consistent with a payment from a suspense account from accumulated trustee disbursements.[94] Once this payment was applied, it brought Wirtz's loan within one month of being current.[95]

---

[90] Eaton Aff. at Ex. U; SLS Dep. at 68:9-15.

[91] SLS Dep. at 68:16-25.

[92] *Id*. at 69:1-11.

[93] *Id*. at 69:11-16.

[94] *Id*. at 69:17-70:13.

[95] *Id*. at 68:9-15.

Wirtz's loan remained one month behind in July and into August.[96] However, then, later in August, something odd happened – and this is the source of the problem that plagues Wirtz's loan to this day. On August 24, 2010 Chase applied funds from Wirtz's suspense account – as it did in June.[97] But, instead of treating this as a mortgage payment – as it did in June – Chase applied the funds toward the principal balance of Wirtz's loan.[98] The result was that, instead of this payment bringing Wirtz's loan current, Wirtz's loan principal balance was reduced by the amount of the payment, $979.36. So, Wirtz's loan remained one month late.[99]

This was clearly a servicing error by Chase. By failing to use this payment to bring Wirtz's loan current Chase went against the terms of Wirtz's mortgage. Wirtz's mortgage requires that "all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due for [escrow items]." [100] Very last in this order is applying payments to principal. The mortgage says: "Any remaining amounts shall be applied first to late charges, second to any other amounts due under [the mortgage], *and then to reduce the principal balance of the Note.*" [101]

---

[96] SLS Dep. at 70:24-71:11.

[97] *Id*. at 71:12-72:9.

[98] *Id*. at 72:10-13.

[99] *Id*. at 72:10-13.

[100] Eaton Aff. at Ex. A, p. WIRTZ0075 (mortgage uniform covenants § 2, Application of Payments or Proceeds").

[101] *Id*. (emphasis added).

Wirtz's loan remained one month late – when it should have been brought current – because Chase failed to apply the August 24, 2010 payment in the order of priority required by the mortgage.[102] At SLS's request, Wirtz sent the documents to SLS – who now stood in Chase's shoes – that contained this information, and SLS's representatives had the training and experience to discover this error, but SLS did not discover it.

### 2.    SLS did not review Wirtz's documents.

The undisputed evidence shows that SLS did not even review these documents for that purpose. SLS mistakenly believed that Wirtz was applying for a loan modification and routed the documents he sent to the modification department.[103] The full evidence of SLS's investigation in response to this letter is limited to SLS's servicing notes.[104] According to the servicing notes, after SLS received he documents, it did a preliminary review for a loan modification, determined not to proceed with the modification, and deactivated the modification process.[105] But nothing in SLS's records indicates that any research was done in connection with its response to Wirtz's qualified written request.[106]

### K.    SLS's failure to correct the error in his account continues to this day and has created additional problems for Wirtz.

SLS's failure to correct this error has continued to cause problems for Wirtz. According to loan statements sent by SLS to Wirtz, SLS has charged Wirtz at least

---

[102] SLS Dep. at 76:7-25,

[103] Eaton Aff. at Ex. V; SLS Dep at 85:18-24; 87:7-15; 89:7-90:12; 91:13-24.

[104] SLS Dep. at 63:11-15; 65:22-66:3; 85:25-86:9.

[105] *Id*. at 93:20-94:4.

[106] *Id*. at 94:5-94:11; 98:23-99:3 (*see also* 94:13-98:23 – reviewing specific servicing entries and confirming that they are not related to SLS's response); Eaton Aff. at Ex. W.

$418.17 in late fees and other charges.[107] Additionally, his loan has been wrongly reported as 30 days late on his credit report since at least the date that SLS took over servicing of his loan.[108] In or about January, 2016, Wirtz met with a loan officer from Employees Federal Credit Union to seek pre-approval for a car loan. The loan officer told him that, due to the late payments reported by SLS, he would qualify for a loan at an annual interest rate of approximately 8%; however, if the late payments were not reported on his record, he would qualify for a loan at an annual interest rate of approximately 5%.[109]

Wirtz did everything in his power to communicate with SLS about the error in his account. After Wirtz called, had the Attorney General send a letter, had his attorney send multiple letters, and even took the extraordinary step of complying with SLS's request that he send SLS loan history records – which SLS should have already had – that showed where the error occurred, SLS could not make a simple fix. Wirtz's loan was incorrectly being reported as one month behind when it was not. By SLS's own admission, when a borrower's loan servicing is transferred from one servicer to another this is supposed to be a smooth process with little perceived change to the borrower. Wirtz's case was anything but smooth. It cost him hours of his time, as well as attorney fees, to attempt to get this simple error remedied. But SLS could not do it. SLS hardly even tried.

---

[107] Eaton Aff. at ¶ 25.

[108] *Id*. at Ex. V

[109] Wirtz Aff. at ¶ 4.

## IV.  ARGUMENT

**A.      Steven Wirtz is entitled to summary judgment under Fed. R. Civ. P. 56.**

A court should grant summary judgment when there are no genuine disputes of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'") Material facts are those that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Genuine disputes are those that include evidence "such that a reasonably jury could return a verdict for the nonmoving party." *Id.* Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

After the moving party has carried its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Id.* A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

Courts must view the facts "in the light most favorable to the party opposing the motion" at summary judgment, including drawing all reasonable inferences from those facts. *Matsushita*, 475 U.S. at 587 (quoting *United States v. Diebold, Inc.*, 369 U.S. 654,

655 (1962)). However, the more implausible the party's legal theory, the heavier the burden on it to come forward with credible evidence to receive that benefit. *Id.*

**B.**     **SLS has violated the Real Estate Settlement Procedures Act.**

The undisputed facts in this case show that SLS violated the Real Estate Settlement Procedures Act. The Real Estate Settlement Procedures Act, or "RESPA", requires that a servicer conduct an appropriate investigation when a borrower puts the servicer on notice of a servicing error. RESPA then requires that, if the account is in error, the servicer correct it. The undisputed facts show that Wirtz properly put SLS on notice of a servicing error by sending multiple qualified written requests. The undisputed facts show that SLS failed to conduct a proper investigation of the error because it did not actually review the information sent by Wirtz. Finally, the undisputed facts show that, had it actually conducted a proper investigation, it should have and would have seen the error in Wirtz's account. Instead, SLS did nothing. For these reasons, as a matter of law, SLS has violated RESPA.

**1.**     **RESPA's purpose is to protect consumers like Wirtz against the exact scenario he is in now.**

The Real Estate Settlement Procedures Act provides a dispute resolution process for borrowers, like Wirtz, who experience servicing errors in connection with their mortgage loans. The purpose of RESPA is consumer protection. *Medrano v. Flagstar Bank, FSB*, 704 F.3d 665 (9th Cir., 2012). "Congress enacted RESPA to provide consumers with greater and more timely information regarding residential real estate settlement costs and services." *Melillo v. GMAC Mortg., LLC*, CIV. 10-3392 ADM LIB,

2011 WL 96629, at *2 (D. Minn. Jan. 11, 2011); *See* 12 U.S.C. § 2601(a). "RESPA's provisions relating to loan servicing procedures should be 'construed liberally' to serve the statute's remedial purpose." *Medrano*, 704 F.3d at 665-66 (*citing In re Herrera*, 422 B.R. 698, 711-12 (9th Cir. BAP 2010)).

To invoke the error resolution requirements of RESPA, a borrower must first send to the lender a "qualified written request". 12 U.S.C. § 2605(e)(1)(A). A qualified written request is a written notice to a mortgage servicer that either requests information or puts the servicer on notice of an error. 12 U.S.C. § 2605(e)(1)(B)(ii). When a borrower notifies a servicer of an error, as Wirtz did, the servicer must then conduct an investigation into the error identified and then either correct the error or provide the borrower a written notification explaining why the servicer believes no error occurred. 12 U.S.C. § 2605(e)(2). If the servicer fails to properly respond to the qualified written request, the borrower has three years from that point to commence an action against the servicer. 12 U.S.C. § 2614; *see e.g. Falcocchia v. Saxon Mortgage, Inc.*, 709 F.Supp.2d 860, 869-70, (E.D. Cal., 2010).

### 2. Wirtz sent to SLS five qualified written requests.

The letter from the Attorney General to SLS sent October 9, 2013, and the letters from Wirtz's attorney sent October 18, 2013, November 8, 2013, November 25, 2013, and December 27, 2013 were qualified written requests. A qualified written request is "a written correspondence that includes, or otherwise enables the servicer to identify, the name and account of the borrower", and "includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error…" 12 U.S.C. §

2605(e)(1)(B). The qualified written request may be sent by the borrower or the borrower's agent. 12 U.S.C. § 2605(e)(1)(A).

Borrowers need not provide a detailed explanation of the reasons for dispute. The statute explicitly requires that the borrower only provide his or her "reasons for belief… that the account is in error…" 12 U.S.C. § 2605(e)(1)(B). "[A]ny request for information made with sufficient detail is enough under RESPA to be a qualified written request and thus to trigger the servicer's obligations to respond." *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676 (7th Cir., 2011).

The undisputed facts show that the five letters sent by Wirtz to SLS were qualified written requests. SLS dos not dispute this as a fact.[110] Additionally, the letters include identifying information about Wirtz's account and the reasons for Wirtz's belief of the error.[111] These were qualified written requests as defined by RESPA.

### 3.   SLS failed to conduct a reasonable investigation in response to Wirtz's qualified written requests.

Once a lender receives a qualified written request from a borrower, it must act. The undisputed facts here show that SLS did not appropriately investigate Wirtz's qualified written requests. Within 30 business days of receipt of the qualified written request, a servicer must "make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction" or "after conducting an investigation, provide the borrower with a written explanation or clarification that includes…  a statement of the

---

[110] SLS Dep. at 22:6-11; 41:24-28; 42:18-43:3; 50:14-51; 60:21-62:3.

[111] Eaton Aff. at Ex. L, P, Q, R, T.

reasons for which the servicer believes the account of the borrower is correct as determined by the servicer." 12 U.S.C. § 2605(e)(2). Even if the servicer takes corrective action, the timing requirement for the correction is strictly enforced. *Rawlings v. Dovenmuehle Mortg., Inc.*, F.Supp.2d 1156, 1163 (M.D. Ala., 1999) (finding RESPA violations when servicer took appropriate corrective action, but did so after requisite time period had expired).

Under RESPA, the investigation must be more than a cursory review. "An investigation is, '[t]he action of investigating; the making of a search or inquiry; systematic examination; careful and minute research.'" *Marais v. Chase Home Fin.*, LLC, 24 F. Supp. 3d 712, 723 (S.D. Ohio, 2014) (*citing* Oxford English Dictionary (2d. ed. 1989)). The servicer's response must address the individual circumstances of the account. *Id*. at 724.

The undisputed facts show that in connection with SLS's response to the first qualified written request – the letter from the Attorney General – SLS conducted an incomplete investigation. Wirtz notified SLS that he believed his loan was not delinquent.[112] However, despite SLS's knowledge that this loan was 12 years old and had been serviced by Chase since 2002, SLS only reviewed two years of servicing history – to June, 2011.[113] SLS concluded that the loan was delinquent at the earliest point in its short records, June, 2011.[114] Yet, SLS did nothing to investigate the earlier servicing

---

[112] Eaton Aff. at Ex. L; SLS Dep. at 20:14-21:10.

[113] *Id*. at Ex. M; SLS Dep. at 25:25-26:7.

[114] SLS Dep. at 27:22-28:9.

history and therefore could not have uncovered any error that occurred before this. SLS made no attempt to retrieve earlier records. SLS never even contacted the prior servicer, Chase – even though it should have received the records as part of the servicing transfer.[115]

Instead, SLS sought this information from Wirtz, demanding that Wirtz provide the prior servicing history – even though Chase, from whom SLS took transfer of servicing of the loan, had been servicing it since 2002.[116] This confounds the RESPA statute. The law says that the <u>servicer</u> shall conduct an investigation, not the borrower. 12 U.S.C. § 2605(e)(2)(B). This was not "careful and minute research", nor did it address Wirtz's specific facts and circumstances.

SLS's next response was worse. When Wirtz's counsel sent on letters on November 8, 12, and 25, 2013, SLS sent a single response.[117] In Wirtz's letters he had explicitly informed SLS that he believed that the conclusions SLS reached in its previous response were incorrect.[118] Yet SLS failed to conduct an investigation that addressed Wirtz's individual circumstances. Even though Wirtz made it clear to SLS that the problem persisted, SLS did not review anything other than what it had reviewed before; nor did SLS contact Chase to retrieve further payment history.[119] Instead, SLS concluded that it had "previously responded to [Wirtz's] requests regarding payment made on the

[115] SLS Dep. at 19:3-12; 34:6-35:2.
[116] Eaton Aff. at Ex. M, p. SLS000002.
[117] *Id*. at Ex. R; SLS Dep. at 49:12-18.
[118] *Id*. at Ex. P, Q, R.
[119] SLS Dep. at 57:6-12.

account" and that SLS had "reviewed and confirmed [its] previous responses as accurate." [120] SLS again demanded that Wirtz conduct the investigation, requesting that Wirtz provide a copy of his loan history for SLS's review.

The final, and most poignant, example of SLS's failure to investigate comes with Wirtz's final letter to SLS. When Wirtz sent his December 27, 2013 letter, he included a copy of his loan history and bank statements showing he had made his payments – as SLS requested.[121] However, the undisputed facts clearly show no investigation by SLS. The facts show only that after SLS received he documents, it did a preliminary review for a loan modification, determined not to proceed with the modification, and deactivated the modification process – even though Wirtz had not applied for a loan modification.[122] Further, SLS admits that it has no evidence to show that it did any research at all in connection with its response to Wirtz's qualified written request.[123] Instead, SLS simply pointed to its previous responses and "consider[ed] this matter resolved." [124]

### 4. SLS clearly should have seen that Wirtz's account was in error. Instead, it did nothing.

Even if SLS had a legitimate basis to require that Wirtz conduct the investigation, and not SLS, the undisputed facts are that the documents Wirtz sent to SLS provided the necessary evidence of the error. They showed that on August 24, 2010 Chase applied

---

[120] Eaton Aff. at Ex. S; SLS Dep. at 52:22-23:19.

[121] SLS Dep. 61:12-62:1.

[122] Eaton Aff. at Ex. V; SLS Dep at 85:18-24; 87:7-15; 89:7-90:12; 91:13-24; 93:20-94:4.

[123] SLS Dep. at 94:5-94:11; 98:23-99:3 (*see also* 94:13-98:23 – reviewing specific servicing entries and confirming that they are not related to SLS's response).

[124] Eaton Aff. at Ex. I; SLS Dep. at 77:24-78:16.

funds from Wirtz's suspense account to principal, when he had a payment due and owing.
[125] This violated the terms of the mortgage.[126] *Nelson v. Saxon Mortg., Inc.*, CIV. 12-1312
JRT/JJG, 2014 WL 186163, at *15 (D. Minn. Jan. 16, 2014) (Servicer must apply
suspense account funds in the priority system required by the mortgage.) RESPA even
explicitly requires that a servicer "take timely action to respond to a borrower's requests
to correct errors *relating to allocation of payments*." 12 U.S.C. § 2605(k)(1)(c) (emphasis
added). Yet SLS did not do this. SLS admits that, had this payment been applied
correctly, it would have brought Wirtz's loan current; but instead, the loan remained one
month late because the payment was not applied correctly.[127] And so the loan remains
one payment late today.

SLS's failure to investigate and correct the error in Wirtz's account was a clear
violation of RESPA. SLS admits that Wirtz had a reasonable expectation that SLS would
review the documents he sent and that SLS would find any servicing errors.[128] Loan
histories are notoriously difficult to interpret, particularly for a layperson like Wirtz.[129]
But SLS's representatives review these regularly and have no problem doing so.[130] But,
instead of addressing the individual facts and circumstances of Wirtz's account, SLS

---

[125] SLS Dep. at 72:10-13.

[126] Eaton Aff. at Ex. A, p. WIRTZ0075 (mortgage uniform covenants § 2, Application of Payments or Proceeds").

[127] SLS Dep. at 72:14-73:7.

[128] *Id*. at 59:4-17; 59:10-60:11.

[129] *Id*. at 33:13-16.

[130] *Id*. at 32:18-33:5; 56:16-23.

refused to investigate further and pointed to its previous responses and "consider[ed] this matter resolved." [131]

The *Marais* court gives a fitting example of why SLS's response was not appropriate. The court analogizes the scenario to dining in a restaurant:

> [I]magine that you are dining in a restaurant and notice an apparent error on the bill. You question the waiter about the error and he, without comment or dialogue, simply returns with a new copy of the exact same bill. Would you feel you had received a "a written explanation or clarification" or that the waiter had "conduct[ed] an investigation" into the alleged error?

*Marais*, 24 F.Supp. 3d. at 724 (internal citation omitted). That court concludes that the servicer's response did not meet the RESPA standard:

> What [the loan servicer] has done here is no different. Indeed, some of the best evidence in the record supporting [the borrower's] claim that there were mistakes made on her account comes from the very documents [the servicer] included in its supposedly explanatory response. Under the circumstances, and even drawing all reasonable inferences in [the servicer's] favor, [the servicer] did not comply with 12 U.S.C. § 2605(e)(2)(B).

*Id*.

Wirtz's case is more egregious than that in *Marais*. In *Marais*, as indicated above, the servicer sent to the borrower the documents that contained the error, yet the servicer did not correct the error. *Id*. But in Wirtz's case, at SLS's request, Wirtz went to the trouble to obtain documents – documents that SLS should have had – that contained the error and sent them to SLS. But like the imagined diner in *Marais*, Wirtz just received the same response back from SLS. As a matter of law, SLS did not comply with 12 U.S.C. § 2605(e)(2)(B).

---

[131] Eaton Aff. at Ex. I; SLS Dep. at 77:24-78:16.

5.      **Wirtz has been damaged by SLS's failure to adequately respond to his qualified written requests.**

As a matter of law, SLS is liable to Wirtz for actual damages, statutory damages, and Wirtz's attorney fees. When a servicer fails to comply with section 2605 of RESPA the servicer is liable for "each such failure" to comply with section 2605 in amounts of "any actual damages to the borrower as a result of the failure" and "[i]n the case of a pattern or practice of noncompliance with the requirements of [section 2605]," statutory damages up to $2,000. 12 U.S.C. 2605(f). In addition to these amounts, the servicer is liable for "the costs of the action, together with any attorney fees incurred in connection with such actions the court may determine to be reasonable under the circumstances." *Id.*

i.      **SLS's failure caused Wirtz to suffer damages.**

The scope of actual damages under RESPA is wide. They include:

- **Out-of-pocket expenses** incurred dealing with the RESPA violation including expenses for preparing, photocopying and obtaining certified copies of correspondence. *McLean v. GMAC Mortg. Corp.*, 595 F.Supp.2d 1360, 1366 (S.D. Fla., 2009) (*citing Rawlings v. Dovenmuehle Mortg.*, Inc., 64 F.Supp.2d 1156, 1164 (M.D.Ala.1999) (finding that the plaintiffs were entitled to recover $115.00 in actual damages for correspondence and travel));

- **Lost time and inconvenience**, such as time spent away from employment while preparing correspondence to the loan servicer, if it resulted in actual pecuniary loss. *Id. (citing Johnstone v. Bank of America, N.A., 173 F.Supp.2d 809, 816 (N.D.Ill.2001);*

- **Late fees**. Id.;

- **Denial of credit or denial of access to full amount of credit line**. *Id.* (*citing Cortez v. Keystone Bank, Inc.*, 2000 WL 536666, *12 (E.D. Pa. May 2, 2000) (if the loan servicer failed to make appropriate corrections within 60 days after receiving a qualified written request it "would be liable for any resulting damages including any denial of credit because of the reporting of such

charges as delinquent to credit reporting agencies."); *Hutchinson v. Delaware Savings Bank FSB*, 410 F.Supp.2d 374 (D.N.J. 2006) (recognizing that denial of credit because of negative reporting to credit reporting agencies could constitute actual damages under RESPA); and

- **Emotional distress**. *Id*. (*citing Ploog v. HomeSide Lending, Inc.*, 209 F.Supp.2d 863, 870 (N.D.Ill.2002) (holding that RESPA's actual damages provision allows for the recovery of emotional distress); *Johnstone v. Bank of America, N.A.*, 173 F.Supp.2d 809, 815 (N.D.Ill.2001); *Wright v. Litton Loan Servicing LP*., No. 05-02611-JF, 2006 WL 891030, *4 (E.D.Pa.2006).

Here, Wirtz can clearly show actual damages. At a bare minimum he incurred $80.00 in bank fees in connection with complying with SLS's demand that he provide documents.[132] Wirtz also incurred at least $418.17 in late fees because of his continued wrongly-claimed late payments.[133] Additionally, Wirtz's loan has been wrongly reported as 30 days late on his credit report since at least the date that SLS took over servicing of his loan.[134] Wirtz was denied a low interest rate when he sought pre-approval for a car loan because of the late payments reported on his credit report.[135] These are all actual damages allowed by RESPA.

### ii.    SLS has demonstrated a pattern or practice of noncompliance with RESPA and therefore Wirtz is allowed statutory damages.

Although Wirtz repeatedly alerted SLS of an error with his account, SLS repeatedly failed to correct the error. Wirtz sent to SLS five qualified written requests to which SLS failed to properly respond. This is a pattern or practice of noncompliance with

---

[132] Wirtz Aff. at ¶ 3.

[133] Eaton Aff. at ¶ 25.

[134] Eaton Aff. at Ex. V

[135] Wirtz Aff at ¶ 4.

RESPA and therefore Wirtz is entitled to statutory damages of $2,000 for each letter, totaling $10,000.00.

The term "pattern or practice" is defined according to the usual meaning of the words. *In re Maxwell*, 281 B.R. 101 (Bankr. Mass., 2002) (*citing Sperling v. Hoffmann-La Roche, Inc.*, 924 F.Supp. 1346, 1357 (D.N.J.1996)) "The term suggests a standard or routine way of operating." *Id.* (*citing Newton v. United Cos. Fin. Corp.*, 24 F.Supp.2d 444, 456 (E.D.Pa.1998) *and First Nat'l Bank v. Office of Comp'r of Currency*, 956 F.2d 1456, 1461-62 (8th Cir.1992). Courts have determined that two failures to respond to a qualified written request does not necessarily equal a "pattern or practice". *In re Maxwell*, 281 B.R. 101 (Bankr. Mass., 2002). But five such failures does equal a "pattern or practice". *Id.* (*citing Ploog*, 2002 WL 433139).

Here, SLS showed a pattern of failing to respond to Wirtz's notifications of error. Wirtz sent to SLS five different qualified written requests. The pattern is that SLS made a cursory investigation into the initial qualified written request sent by the Attorney General then, in response to the four subsequent qualified written requests sent by Wirtz's attorney, it made no further investigation and relied on its previous response – even when put on specific notice that Wirtz believed the response was wrong – and when provided sufficient documentation from Wirtz to allow SLS to uncover the error. Nothing in the record indicates that Wirtz would have received a different result if he had sent one, two, or ten more qualified written requests. This is a clear pattern.

Each time Wirtz sent to SLS a qualified written request, and SLS failed to correct the error or conduct an adequate investigation, SLS violated RESPA. Wirtz sent five

qualified written requests and therefore SLS violated RESPA five times. The statute explicitly states that the servicer is liable for statutory damages of $2,000 "for each such failure" to comply with section 2605. 11 U.S.C. § 2605(f). SLS is therefore liable for $10,000 in statutory damages.

### iii.   SLS is liable for Wirtz's attorney fees.

RESPA expressly requires that a servicer violating the requirements of section 2605 "*shall* be liable to the borrower" for attorneys fees incurred in connection with an action under the section. 11 U.S.C. § 2605(f)(3) (emphasis added). Wirtz has incurred attorney fees in this matter.[136] SLS is liable for attorney fees.

As demonstrated above, SLS has violated RESPA. After Wirtz sent multiple qualified written requests, SLS failed to conduct an adequate investigation into his problem and fix his error. SLS is liable to Wirtz for actual damages, statutory damages, and attorney fees.

## C.   SLS has breached the implied covenant of good faith and fair dealing.

As a matter of law, SLS owes Wirtz a duty of good faith. Every contract includes an implied covenant of good faith and fair dealing. *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995) (citing Restatement (Second) of Contracts § 205). The implied covenant of good faith extends a duty that one party to the contract cannot unjustifiably hinder the other party's performance. *In re Hennepin Cnty.*, 540 N.W.2d at 502. The implied covenant of good faith and fair dealing applies between

---

[136] Wirtz Aff. at ¶ 5.

SLS and Wirtz. *Nelson.*, No. CIV. 12-1312 JRT/JJG, 2014 WL 186163, at *19-20 (finding a mortgagee owes a mortgagor a duty of good faith and fair dealing).

By SLS's actions it has breached the requirement of good faith with respect to Wirtz's mortgage and note. As a servicer, SLS is bound by the terms of the mortgage and note. [137] By its actions, as described above, SLS caused Wirtz to remain in breach of his loan and therefore unjustifiably hindered Wirtz's performance under the loan. That is, because SLS did not correct the servicing error Wirtz put it on notice of, Wirtz's loan remained one month behind when it should have been current. This is violation of the implied covenant.

**D.     SLS has violated Minnesota's Mortgage Originator and Servicer Licensing Act.**

Minnesota's Residential Mortgage Originator and Servicer Licensing Act provides for extra damages when a lender fails to fulfill its obligations to a borrower. Because SLS's actions fall within the conduct forbidden by the Act, the Wirtz is entitled to statutory damages and attorney fees from the SLS.

The Mortgage Originator and Servicer Licensing Act serves two primary purposes. First, it broadens the scope of claims a borrower may bring against a lender. In addition to forbidding specific acts by lenders, it confers standing on a borrower in cases where a borrower may not otherwise have standing. Under the Act, a lender is liable to a borrower when it when violates any provision of any state or federal law regulating

---

[137] SLS Dep. at 12:13-16.

residential mortgage loans.[138] Minn. Stat. § 58.13(8). A lender is also liable under the Act

when it fails to perform on its written agreements with not only the borrower, but with

third parties such as borrowers, investors, other licensees, or exempt persons. Minn. Stat.

§ 58.13(5). It increases protections for borrowers because the Act is explicitly

cumulative. It does not serve to "restrict any other right or remedy otherwise available to

the borrower." Minn. Stat. § 58.18, Subd. 3.

Second, the Act provides for additional damages to borrowers injured by their

lenders. A lender who violates the Act is liable for (1) actual, incidental, and

consequential damages; (2) statutory damages equal to the amount of all lender fees

included in the amount of the principal of the loan; (3) punitive damages if appropriate;

and (4) court costs and reasonable attorney fees. Minn. Stat. § 58.18, Subd. 1.

Wirtz is entitled to damages allowed by the statute. As discussed above, Chase

failed to perform in conformance with the mortgage when it misapplied the funds from

Wirtz's suspense account. And SLS failed to perform in conformance with the mortgage

when it failed to remedy this problem. SLS further failed to perform in conformance with

the mortgage when it breached the implied covenant of good faith and fair dealing.

Finally, SLS violated federal law when it violated RESPA.

By breaching its contract with Wirtz and violating RESPA, as a matter of law,

Wirtz is entitled to the additional remedies allowed by the statute of statutory damages

---

[138] As an illustration RESPA confers a private right of action on borrowers for certain
violations, but not others. *Compare*, *e.g.*, 12 U.S.C. §§ 2605(f) and 2609(d).

38

equal to the amount of all lender fees included in the amount of the principal of the loan and court costs and reasonable attorney fees. Minn. Stat. § 58.18, Subd. 1.

**E.     SLS has violated the Fair Debt Collections Practices Act.**

By its actions, SLS repeatedly attempted to collect money from Wirtz that he did not owe. By doing so, SLS has violated the FDCPA. Under the FDCPA, a debt collector may not make false representations of the character, amount, and legal status of the debt claimed to be owed to it. 15 U.S.C. § 1692e(2).

SLS is a debt collector as that term is defined by the FDCPA. SLS admits to it.[139] The undisputed facts also show that Wirtz's loan was in default when the servicing was assigned to SLS.[140] *Motley v. Homecomings Fin., LLC*, 557 F. Supp. 2d 1005, 1009 (D. Minn. 2008) (debt must be in default at time of servicing transfer if servicer is to be considered a debt collector under the FCPA). And, Wirtz is a natural person obligated to pay a debt.[141]

SLS made multiple false representations of the character, amount, and legal status of his debt. SLS repeatedly told Wirtz that his loan was delinquent, when it was not. Or, during the times when Wirtz did not make his payments because he was not receiving statements, SLS represented that Wirtz's loan was more delinquent than it actually was. This is a violation of 15 U.S.C. § 1692e(2). Wirtz is entitled to statutory damages of $1000 and attorney fees. 15 U.S.C. § 1692k(a)(2)(A).

---

[139] SLS Dep. at 24:10-14.

[140] *See e.g.* Eaton Aff., Ex. F at 01:10-02:58.

[141] *See* Ex. B.

## V.   CONCLUSION

SLS could not correct a simple accounting error on Steve Wirtz's mortgage loan.

Congress passed the Real Estate Settlement Procedures Act for this exact scenario: to

allow a borrower to notify a servicer of a problem, and have that problem fixed. In

Wirtz's case, he went to extraordinary measures to notify SLS of the error in his account.

But SLS did not correct the error. Instead, it conducted a woefully incomplete

investigation and wrote him off. This error continues to saddle Wirtz today. Wirtz

respectfully requests that the Court grant his motion for summary judgment.

Dated: March 18, 2016                    **CHRISTENSEN LAW OFFICE PLLC**

                                         /s/ Daniel M. Eaton
                                         Daniel M. Eaton (#389452)
                                         Attorney for Plaintiff
                                         800 Washington Ave. N.
                                         Ste. 704
                                         Ph: (612) 823-0188
                                         Fax: (612) 823-4777
                                         dan@clawoffice.com